UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

WELLS FARGO BANK, N.A.,

                          Plaintiff,

               v.

ESM FUND I, LP et al.,

                          Defendants.

10 Civ. 7332 (LBS)

**MEMORANDUM &
ORDER**

---

SAND, J.

Interpleader Plaintiff Wells Fargo Bank, N.A. ("Wells Fargo") brings this action in its capacity as Trust Administrator to determine the rights of the Interpleader Defendants to distributions made under the MASTR Adjustable Rate Mortgages Trust 2006-OA2 ("Trust"). Interpleader Defendants Alexander Bakal, David Ittah, David Visher, and the ESM Parties (collectively "Certificateholders") are owners of "Super Senior" certificates issued by the Trust. Interpleader Defendant Assured Guaranty ("Assured") is the Certificate Insurer under the Trust.

All Interpleader Defendants move for judgment on the pleadings as to the interpretation of the Pooling & Servicing Agreement ("PSA"), which governs the distributions. Assured also seeks judgment on the pleadings dismissing cross-claims asserted by the ESM Parties for reformation, breach of insurance policy, and unjust enrichment. As a disinterested party, Wells Fargo asks the Court to enjoin the Interpleader Defendants from commencing any separate proceeding against it concerning the issues in this action and to award it costs and attorney's fees. For the reasons contained herein, the motion for judgment on the pleadings is granted, with the PSA to be interpreted in accordance with this decision; the ESM Parties' cross-claims are dismissed; and Wells Fargo's motion is granted in its entirety.

1

## I. Background

Interpleader Plaintiff Wells Fargo is a national banking association with its main office in Sioux Falls, South Dakota.  Wells Fargo is the Master Servicer, Trust Administrator, and Custodian of the Trust under the PSA.  Interpleader Defendant Assured (f/k/a Financial Security Assurance Inc.) is a financial guaranty insurance company organized under the laws of the State of New York.  Interpleader Defendants the ESM Parties consist of ESM Fund I, LP, a Delaware limited partnership, SAV LLC, a Delaward limited liability company, and Compass Offshore SAV PPC Ltd., a non-U.S. company.   Individual Interpleader Defendants Bakal, Ittah, and Visher, each appearing *pro se*, reside in New York, Pennsylvania, and California, respectively.

The Trust operates by pooling subprime mortgages and issuing certificates to investors who are entitled to eventual return of their principal and to interest payments paid using funds received by the Trust from borrowers on the mortgages.  Wells Fargo, as Trust Administrator, is obligated to distribute the funds available to the Trust to the certificateholders and to the Certificate Insurer on specified distribution dates.

The Trust contains multiple classes of certificates with different levels of risk.  The two classes of certificates relevant here are Super Senior and Senior Support.[1]  The PSA provides that certificateholders in both classes are entitled to guaranteed interest payments each month.  Certificateholders also receive a portion of their principal each month, such that the certificates should be entirely paid off by the specified end date.  Sheth Decl. Ex. 1 § 4.02(a)(5) ("PSA"); Sheth Decl. Ex. 2, at S–66–67 ("Pro Supp") (defining principal remittance and distribution amounts).  If the Trust experiences losses—for example, if a home is foreclosed on and sold for

---

[1] The Prospectus Supplement identifies the Class 1-A-1, Class 2-A-1, Class 3-A-1, Class 4-A-1A, and Class 4-A-1B certificates as "Super Senior," Class 1-A-2 and Class 2-A-2 certificates as "Super Senior, Senior Support," and Class 1-A-3, Class 2-A-3, and Class 4-A-2 certificates as "Senior Support."  Pro Supp S-7.  Various other classes are not relevant to this action.

2

less than the amount remaining on the mortgage—the losses are deducted as "realized losses" from the principal of the certificates.  The certificateholders are not entitled to receive interest on that portion of the principal in the future, or to the return of that principal at maturity, unless the Trust unexpectedly receives money on a mortgage loan that was previously declared to be a loss ("Subsequent Recoveries").  Pro Supp S-88.

The "payment waterfall" contained in the PSA provides that Super Senior certificates (a/k/a "Uninsured Certificates") and Senior Support certificates (a/k/a "Insured Certificates") receive their guaranteed interest concurrently.  PSA § 4.02(a)(2).  However, realized losses experienced by the Trust are allocated to the Senior Support certificates first.  Pro Supp S-22, S-87.  Super Senior certificates will not experience losses until the Senior Support principal is exhausted.  Similarly, Subsequent Recoveries are applied to the certificates in the reverse order, with the Super Senior certificates receiving funds before the Senior Support certificates.[2] However, unlike Super Senior certificates, Senior Support certificates benefit from an insurance policy provided by Assured.  Pro Supp S-82.  Assured is obligated to pay the guaranteed interest owed to the Senior Support certificateholders in the event that there are insufficient funds in the Trust to make the monthly payments, to reimburse certificateholders for realized losses deducted from the Senior Support principal, and to pay out principal at bond maturity if there are insufficient funds to do so.  Sheth Decl. Ex. 3, at 1 ("Policy"); Pro Supp S-12, S-82.  In the event that Assured pays a claim under the Policy, the PSA provides it with the right to be repaid some or all of its payouts at certain steps in the waterfall, including section 4.02(a)(3).  This dispute is over the amount and timing of these payments to Assured.

---

[2] PSA § 4.02(d) ("Application of Subsequent Recoveries"); *see also*, PSA §§ 4.02(a)(8)(a)–(d).

In July 2010, realized losses on the mortgage loans within the Trust reached the Senior Support certificates for the first time since the Trust was formed in 2006. Pursuant to the Policy, Assured paid $7,199,157.47 to compensate the Senior Support certificateholders for unpaid interest and realized losses deducted from their principal. On the August 2010 distribution date, Wells Fargo distributed payments under the first two steps of the waterfall, then credited the entire $7,199,157.47 to Assured at section 4.02(a)(3) of the waterfall. This reduced by that same amount the funds available to distribute under subsequent provisions of the waterfall, including principal payments that the Super Senior certificates would have received absent the credit to Assured. It also reduced the claim Assured would otherwise pay Insured Certificates under the Policy, as the credit was used to pay Senior Support certificateholders. Shortly thereafter, Certificateholder Defendants requested that Wells Fargo correct what they believed was a mistake and redistribute the funds. On the September, October, and November 2010 distribution dates, Wells Fargo made payments under sections 4.02(a)(1) and (2) but put remaining funds into interpleader escrow accounts. This action was commenced on September 23, 2010.

## II. Legal Standard

"Under Rule 22, interpleader is proper if the party requesting it 'is or may be exposed to double or multiple liability.'" *Washington Elec. Co-op., Inc. v. Paterson, Walke & Pratt, P.C.*, 985 F.2d 677, 679 (2d Cir. 1993) (quoting Fed. R. Civ. P. 22(1)). The Court finds, and the parties do not dispute, that Wells Fargo has been confronted with competing claims with respect to the rights to the funds it has placed in escrow. Wells Fargo has not claimed any interest in the escrowed funds. Accordingly, this interpleader action is proper.

All parties move for judgment on the pleadings under Federal Rule of Civil Procedure 12(c). "A party is entitled to judgment on the pleadings only if it is clear that no material issues

4

of fact remain to be resolved and that it is entitled to judgment as a matter of law." *Citibank, N.A. v. Morgan Stanley & Co. Int'l., PLC*, 724 F. Supp. 2d 407, 414 (S.D.N.Y. 2010). "The same standard applicable to [Rule] 12(b)(6) motions to dismiss applies to [Rule] 12(c) motions for judgment on the pleadings," *Bank of N.Y. v. First Millennium, Inc.*, 607 F.3d 905, 922 (2d Cir. 2010), and the court must draw all reasonable inferences in the non-movant's favor.[3] *Citibank, N.A. v. Morgan Stanley*, 724 F. Supp. 2d at 402–03.

The parties agree that New York law governs the PSA. "Under New York law, '[t]he fundamental, neutral precept of contract interpretation is that agreements are construed in accord with the parties' intent.'" *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*, 375 F.3d 168, 177 (2d Cir. 2004) (quoting *Greenfield v. Philles Records, Inc.*, 780 N.E.2d 166 (N.Y. 2002)). "Where the language of the contract is unambiguous, and reasonable persons could not differ as to its meaning, the question of interpretation is one of law to be answered by the court." *Rothenberg v. Lincoln Farm Camp, Inc.*, 755 F.2d 1017, 1019 (2d Cir. 1985); *cf. Consarc Corp. v. Marine Midland Bank*, 996 F.2d 568, 573–74 (2d Cir. 1993) ("Where reasonable minds could be said to differ because the language the parties used in their written contract is susceptible to more than one meaning—each as reasonable as the other—and where extrinsic evidence of the parties' actual intent exists, it should be submitted to the trier of fact."). "Contract language is ambiguous if it is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire

---

[3] The Certificateholder Defendants urge the Court to draw inferences in their favor under the doctrine of contra proferentem, which is used to determine the intent of parties to an insurance contract when a court concludes that an insurance provision is ambiguous. First, "the court may accept any available extrinsic evidence to ascertain the meaning intended by the parties during the formation of the contract." *Alexander & Alexander Servs., Inc. v. These Certain Underwriters at Lloyd's, London, England*, 136 F.3d 82, 86 (2d Cir. 1998). If the extrinsic evidence does not yield a conclusive answer as to the parties' intent, contra proferentem "provides that where an insurer drafts a policy 'any ambiguity in [the] . . . policy should be resolved in favor of the insured.'" *Morgan Stanley Grp. Inc. v. New England Ins. Co.*, 225 F.3d 270, 276 (2d Cir. 2000) (quoting *McCostis v. Home Ins. Co.*, 31 F.3d 110, 113 (2d Cir. 1994). This doctrine does not apply where, as here, no discovery as to extrinsic evidence has been conducted.

integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Pension Plan*, 7 F.3d 1091, 1095 (2d Cir. 1993) (internal quotation marks and citation omitted).  The question of "[w]hether or not a writing is ambiguous is a question of law to be resolved by the courts." *Eternity Global Master Fund*, 375 F.3d at 178.

III. **Discussion**

    a.  **Interpreting the PSA**

This case centers around the interpretation of section 4.02(a)(3) of the payment waterfall.[4]  Assured reads 4.02(a)(3) as granting it the right to reimbursement for all claims paid under the Policy, both for guaranteed interest and principal, to the extent the funds available on the distribution date exceed the amounts necessary to pay certificateholders under sections 4.02(a)(1) and (2).  Assured claims that it should be fully reimbursed under section 4.02(a)(3) before any certificateholder is paid principal under section 4.02(a)(5) because 4.02(a)(3) is higher in the waterfall than 4.02(a)(5) and thus has a higher priority.  Wells Fargo made its initial payment in accordance with this interpretation, though it takes no position as to its accuracy.  Wells Fargo Resp. to Certificateholder Defs.' Mot. J. Pleadings 2.  According to Assured, this "reimbursement" right under 4.02(a)(3) is separate and independent from its right of subrogation.  The right of subrogation is contained in PSA section 12.05[5] and in the Policy.[6]

Certificateholder Defendants deny that 4.02(a)(3) grants Assured a separate reimbursement right.  They argue that the Trust documents only permit Assured to collect funds

---

[4] The text of section 4.02 is annexed to this opinion as Appendix.
[5] PSA § 12.05 ("[T]o the extent the Certificate Insurer makes payments, directly or indirectly, on account of principal of or interest on any Insured Certificate to the Holder of such Certificate, the Certificate Insurer will be fully subrogated to the rights of such Holder to receive such principal and interest from the Trust Fund.").
[6] Policy 1 ("[Assured] shall be subrogated to the rights of each Holder to receive distributions with respect to each Certificate held by such Holder to the extent of any payment by Financial Security hereunder.").

that arise from its subrogation to the certificates it insures, to wit, any amount that would otherwise be paid to the Senior Support certificateholders had they not given up their rights to it. The Court finds that the PSA language is unambiguous and is properly interpreted in the manner suggested by Certificateholder Defendants, but only to the extent necessary to resolve the question pending before this Court.

The payment waterfall functions as follows.  At section 4.02(a)(2) of the waterfall, the Trust is required to pay Senior Support holders all guaranteed interest that went unpaid on prior distribution dates.  Where these amounts were previously paid out under the Policy, Assured's subrogation rights would come into play, and Wells Fargo would pay Assured the past due interest under section 4.02(a)(3).  Similarly, when the Trust recovers unexpected funds from a mortgage, the loss from which had been deducted from the principal of the Senior Support certificates, Senior Support holders would be entitled to be paid the recovered amount at section 4.02(a)(5) of the waterfall.  Pro Supp S-58 ("Although Subsequent Recoveries, if any, will be allocated to increase the Class Principal Balance . . . such Subsequent Recoveries will be included in the Principal Remittance Amount for the applicable Loan Group . . .").  Where the certificateholders were previously paid the realized loss amount under the Policy, Wells Fargo uses the recovered funds to reimburse Assured under section 4.02(a)(5) of the waterfall.[7]

Sections 4.02(a)(8)(a) through (d) provide for reimbursement of any unpaid realized loss, "to the extent not covered by the Certificate Insurance Policy," even if there has been no subsequent recovery, if there is sufficient money in the Trust to reimburse the Senior Support certificateholders for the losses.  PSA §§ 4.02(a)(8)(a)–(d); Pro Supp S-71 (defining Unpaid Realized Loss Amount).  These same sections provide that, in the event that the

---

[7] PSA §§ 4.02(a)(5)(A)(1)(a)(ii), (b)(ii), (d)(ii), (a)(5)(A)(2), (a)(5)(B)(1)(a)(ii), (b)(ii), (d)(ii), (a)(5)(B)(2).

certificateholders were previously paid under the Policy, Assured would receive the excess

amount.  PSA §§ 4.02(a)(8)(a), (b), (d), (a)(9).

Thus, Assured is entitled to whatever funds would otherwise be owed to the Senior

Support holders, which it receives in the step immediately following the step at which the Senior

Support holders would otherwise be paid.  This interpretation is clear from the face of the

Contract and is also supported by the general structure of the Trust.

### i.  Trust Structure & ERISA Eligibility

The governing documents clearly evince the drafters' intent that Super Senior certificates

not be subordinated to any other group, including the Certificate Insurer.  The Free Writing

Prospectus states that the Super Senior class will "not bear its proportionate share of realized

losses (other than excess losses) as its share is directed to another class."  Sheth Decl. Ex. 4, at S-

50 ("FW Prospectus").  More importantly, the Prospectus Supplement, filed with the SEC,

defines certain of the Super Senior certificates as "ERISA-eligible."[8]  ERISA eligibility stems

from a Department of Labor ("DOL") administrative exemption that permits employee benefit

plans governed by ERISA to acquire and hold certain mortgage-backed pass-through certificates.

PTE 83-1, 48 Fed. Reg. 895 (Jan. 7, 1983).  Certificates only qualify for ERISA eligibility if "the

rights and interests evidenced by such certificates are not subordinated to the rights and interests

evidenced by other certificates of the same mortgage pool."  *Id*. at 899; Pro Supp 116.   The DOL

also requires that "the sponsor and trustee of the pool must maintain a system for insuring or

otherwise protecting the pooled mortgage loans and the property securing the mortgage loans,

and for indemnifying certificateholders against reductions in pass-through payments due to

mortgage loan defaults or property damage."  PTE 83-1, 48 Fed. Reg. at 899.  Here, the requisite

---

[8] The eligible classes are Class 1-A-1, Class 2-A-1, Class 3-A-1, Class 4-A-1A, and 4-A-1B.  Pro Supp S-23.

protection is provided by the Senior Support class, which is designed to "absorb[] the realized losses other than excess losses that would otherwise be allocated to a Super Senior class after the related classes of subordinated certificates are no longer outstanding."[9]  FW Prospectus S-50.

If Assured's interpretation were correct, then the Super Senior certificates would be structurally subordinated to the Senior Support certificates through the operation of the Policy and the payment waterfall.  Because the Senior Support holders would be paid out in full by the Policy, and Assured would be paid back in full before the Super Senior certificates are repaid, when the Trust experiences losses, Super Senior holders would bear the losses first, with Assured bearing losses only if the Super Senior principal is completely wiped out.  Such an interpretation cannot be squared with the express intent of the drafters to maintain an unsubordinated, ERISA eligible, Super Senior class.

Assured contends that the classification may have been a mistake on the part of those who filed the Prospectus Supplement, such as UBS Securities LLC, for which Assured is "not responsible," and, in any case, the classification "is irrelevant to the priority of payment in the PSA."  These efforts to downplay the importance of the classification are not persuasive.  Assured's Mem. Opp'n to Cross-Mot. 16, n.12.  The Court finds that the ERISA classification is persuasive evidence of the intent of all of the participants in this offering.

### ii.  Text of the PSA

"[U]nder New York law, effect and meaning must be given to every term of the contract, and reasonable effort must be made to harmonize all of its terms."  *India.Com, Inc. v. Dalal*, 412 F.3d 315, 323 (2d Cir. 2005) (quotation omitted).  While both sides of the dispute assert that the

---

[9] The "subordinated certificates" referred to are a third class of certificates subordinate to both senior classes and not relevant to this action.  Pro Supp 2-21.

other's interpretation reads out portions of the PSA, the Certificateholders have the better of the argument.

The payment waterfall provides for Assured to be paid at 17 different points, each immediately following a step in the waterfall that would have provided payment—either of interest or of principal—to the holders of Insured Certificates, had they not given up their right to it.  Assured's interpretation would render the 16 steps that follow section 4.02(a)(3) in the waterfall meaningless, as Assured would be fully reimbursed at 4.02(a)(3).  Assured's suggestion that this is an intentional "belt and suspenders" approach is not convincing.  The Court has been unable to construct a scenario in which Assured would receive a payment through any of the 16 steps that follow section 4.02(a)(3).  Furthermore, Assured provides no other explanation as to why each payment to Assured should directly follow a payment to the Insured Certificates.

Assured's interpretation would also render unnecessary the portion of the PSA that separately defines the "Class IA3 Certificate Insurer Reimbursement Amount," "Class 2A3 Certificate Insurer Reimbursement Amount," and "Class 4A2 Certificate Insurer Reimbursement Amount."  Because, under Assured's interpretation, the amount reimbursed at 4.02(a)(3) includes all amounts Assured has paid under the Policy, there would never be any need to calculate or define the separate amounts owed to the individual classes that only become necessary when reimbursement takes place at 4.02(a)(5) and beyond.

That "reimbursement" has a different dictionary definition than "subrogation" is of little importance here.[10]  The two terms are not mutually exclusive; Assured is to be repaid, "but only from the sources and in the manner provided herein for the payment of such principal and interest,"

---

[10] Black's Law Dictionary defines reimbursement as simply "repayment."  Black's Law Dictionary (9th Ed. 2009). It defines subrogation as "[t]he principle under which an insurer that has paid a loss under an insurance policy is entitled to all the rights and remedies belonging to the insured against a third party with respect to any loss covered by the policy."  *Id*.

PSA § 12.05, to wit, through subrogation.  If the drafters had intended to provide Assured with a reimbursement right separate from its right of subrogation, it is implausible that they would use the waterfall to grant such a right and not include any mention of it in the section of the PSA expressly devoted to the rights of the Certificate Insurer, PSA § 12.05 (mentioning only subrogation rights), nor in the Policy or Prospectus Supplement.  Policy 1 (same); Pro Supp S-84 ("Terms of the Certificate Insurance Policy") (same).  Furthermore, it is unlikely that the drafters would fail to expressly provide for the subrogation payments in the waterfall.  The far more reasonable interpretation is that the provisions of the waterfall that provide for payment to Assured refer to the subrogation rights granted at section 12.05.

The parties' motion for judgment on the pleadings and declaratory relief is granted to the extent described herein.  Assured is to repay to the Trust the $7,199,157.47 credited to it by Wells Fargo.  Wells Fargo is to distribute the escrowed funds and the credited amount in accordance with this opinion.

### b.  The ESM Parties' Cross-Claims Against Assured

Assured also moves for judgment on the pleadings with respect to the ESM Parties' cross-claims on the ground that they are legally deficient.  Because the Court does not adopt Assured's interpretation of the PSA, the ESM Parties' claim for a reformation is dismissed as moot.  The ESM Parties' claim for unjust enrichment is similarly moot as any misallocation of funds should be remedied by this decision.  The remaining claim is breach of insurance policy.

The ESM Parties allege that Assured breached the Policy when it used the credit allocated to it by Wells Fargo to pay out claims under the Policy.  The Court need not reach the merits of this claim because the ESM Parties are neither parties to nor third-party beneficiaries of the Policy and thus do not have standing to assert a claim for breach of the Policy.  As a general

rule, a litigant "must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Warth v. Seldin*, 422 U.S. 490, 499 (1975). "New York law follows the Restatement (Second) of Contracts § 302 (1979) in allowing a third party to enforce a contract if that third party is an intended beneficiary of the contract." *Flickinger v. Harold C. Brown & Co.*, 947 F.2d 595, 600 (2d Cir. 1991) (citing *Fourth Ocean Putnam Corp. v. Interstate Wrecking Co.*, 485 N.E.2d 208, 212 (N.Y. 1985)). "Although a third party need not be specifically mentioned in the contact [sic] before third-party beneficiary status is found, New York law requires that the parties' intent to benefit a third party must be shown on the face of the agreement." *In re Gulf Oil/Cities Serv. Tender Offer Litig.*, 725 F. Supp. 712, 733 (S.D.N.Y. 1989). "Absent such intent, the third party is merely an incidental beneficiary with no right to enforce the contract." *Id.*; *see also Highlands Ins. Co. v. PRG Brokerage, Inc.*, No. 01 Civ. 2272 (GBD), 2004 WL 35439, at *14 (S.D.N.Y. Jan. 6, 2004) (holding insurance brokers who received commissions were not third party beneficiaries of insurance contracts where policies did not expressly include provision to pay broker fees).

The ESM Parties argue that the Policy expressly states that it is for the benefit of all holders, including holders of Uninsured Certificates. The ESM Parties cite the following language in support of their conclusion: "[Assured] UNCONDITIONALLY AND IRREVOCABLY GUARANTEES to each Trustee for the benefit of each Holder, subject only to the terms of this Policy . . . the full and complete payment of Guaranteed Distributions with respect to the Certificates of the Trust referred to above." Policy 1. However, the word "Holder" clearly refers only to holders of Insured Certificates, who benefit from the Policy, not holders of Uninsured Certificates, such as the ESM Parties, who are nowhere referenced in the contract. Nor do the surrounding circumstances suggest that the ESM Parties were intended

12

beneficiaries of the Policy, as the ESM Parties and other holders of Super Senior certificates would under no circumstances recover funds under the Policy. *See, e.g.*, *Air Atlanta Aero Eng'g Ltd. v. SP Aircraft Owner I, LLC*, 637 F. Supp. 2d 185, 194 (S.D.N.Y. 2009) (noting it "may be appropriate to look to the 'surrounding circumstances' when a contract's literal terms are ambiguous or provide latitude"). ESM thus lacks standing to bring a claim for breach of insurance policy, and the claim is dismissed.

### c. **Wells Fargo's Motion for Interpleader Relief**

Wells Fargo moves for discharge from this action and a permanent injunction against any future proceedings resulting from its control over the funds at issue. Because the Court has concluded that this interpleader action is appropriate, Wells Fargo is entitled to discharge and protection from further liability arising out of any claims to the funds at issue in this action. *See Fidelity Brokerage Servs., LLC v. Bank of China*, 192 F. Supp. 2d 173, 182–183 (S.D.N.Y. 2002) (granting similar relief where interpleader was proper and plaintiff acted in good faith); *Hausler v. JP Morgan Chase Bank, N.A.*, 740 F. Supp. 2d 525, 541–42 (S.D.N.Y. 2010) (noting interpleader plaintiffs should be discharged from action "and amply protected from liability to third parties").

Wells Fargo also seeks unreimbursed legal fees, expenses, and costs on behalf of itself and the Trust. "Attorney's fees and costs are generally awarded to a disinterested stakeholder who has expended time and money participating in a dispute not of his own making and the outcome of which has no impact on him." *Weininger v. Castro*, 462 F. Supp. 2d 457, 501 (S.D.N.Y. 2006) (internal quotation marks omitted). Because Wells Fargo meets these criteria, the Court grants it reasonable attorney's fees and costs, subject to an application to the Court in accordance with Rule 54. Attorney's fees and costs "are generally awarded against the

interpleader fund, but may, in the discretion of the court, be taxed against one of the parties when their conduct justifies it." *Septembertide Publ'g, B.V. v. Stein & Day, Inc.*, 884 F.2d 675, 683 (2d Cir. 1989). In this case, no claimant has exhibited behavior justifying such a decision by the Court; therefore, Wells Fargo's attorney's fees and costs will be awarded against the interpleader fund, to be divided between the claimants on a pro rata basis.

**IV. Conclusion**

For the reasons set forth above, Certificateholders' motion for- judgment on the pleadings is granted. The Court holds that Assured is entitled only to subrogation of the rights of the Insured Certificates at each stage that the Certificate Insurer is identified in the payment waterfall. Wells Fargo is to distribute the funds it has held in escrow during the pendency of this litigation, with interest, in accordance with this opinion. Assured is to repay to the Trust the $7,199,157.47 credited to it by Wells Fargo, and this amount is to be distributed in accordance with this opinion. The ESM Parties' cross-claims are dismissed in their entirety. Wells Fargo's motion is granted in all respects. Defendants are hereby enjoined from commencing any separate proceeding against Wells Fargo concerning or relating to the issues in this action. Wells Fargo shall submit to the Court a detailed accounting of its attorneys' fees and costs and a proposed judgment within fourteen (14) days hereof.

SO ORDERED.

Dated: March 29, 2011
      New York, NY

_____
U.S.D.J.

14

# APPENDIX

Pooling & Servicing Agreement
Section 4.02.  Priorities of Distributions on the Certificates.

   (a)     On each Distribution Date, the Trust Administrator shall withdraw the Available Funds, (to the extent on deposit in the Distribution Account) from the Distribution Account and, pursuant to written instruction received from the Master Servicer as set forth in Section 4.04(a), upon which it may conclusively rely, apply such funds, first to distributions in respect of the Subsidiary REMIC Regular Interests, the Middle REMIC 1 Regular Interests and the Middle REMIC 2 Regular Interests, as provided in the Preliminary Statement, and then to distributions on the Certificates and to the Certificate Insurer in the following order and priority and, in each case, to the extent of such Available Funds:

   (1) *first*, concurrently, to each Class of Interest Only Certificates, pro rata, up to the Current Interest and the Interest Carry Forward Amount for each such Class and such Distribution Date;

   (2) *second*, concurrently,

      (A) to each Class of Senior Certificates (other than the Interest Only Certificates), pro rata, up to the Current Interest and the Interest Carry Forward Amount for each such Class and such Distribution Date; and

      (B) to the Certificate Insurer, up to the Premium Distribution Amount, if any, for such Distribution Date;

   (3) *third*, to the Certificate Insurer, up to the Aggregate Certificate Insurer Reimbursement Amount, if any, for such Distribution Date;

   (4) *fourth*, sequentially, to the holders of the Class M-1, Class M-2, Class M-3, Class M-4, Class M-5, Class M-6, Class M-7 and Class M-8 Certificates, in that order, up to the Current Interest for each such Class and such Distribution Date.

   (5) *fifth*, (A) on each Distribution Date (a) prior to the Stepdown Date or (b) on which a Trigger Event is in effect in the following order of priority, in an amount up to the Principal Distribution Amount:

   (1) first, in an amount up to the Principal Distribution Amount for that Distribution Date, concurrently, to the following Classes of Certificates, pro rata on the basis of the related Group Principal Distribution Amount:

      (a) in an amount up to the Group 1 Principal Distribution Amount for such Distribution Date, sequentially:

         (i)    first, concurrently, to the Group 1 Certificates, pro rata based on Class Principal Balance, until their respective Class Principal Balances are reduced to zero;

         (ii)   second, to the Certificate Insurer, up to the Class 1-A-3 Certificate Insurer Reimbursement Amount, to the extent not paid pursuant to clauses (2)(B) and (3) above; and

         (iii)  third, concurrently, to the Group 2 Certificates, Group 3 Certificates and Group 4 Certificates, pro rata based on Class Principal Balance (after any payments to such Certificates from the related Group Principal Distribution Amount), until their respective Class Principal Balances are reduced to zero;

      (b) in an amount up to the Group 2 Principal Distribution Amount for such Distribution Date, sequentially:

1

(i)      first, concurrently, to the Group 2 Certificates, pro rata based on Class Principal Balance, until their respective Class Principal Balances are reduced to zero;

(ii)     second, to the Certificate Insurer, up to the Class 2-A-3 Certificate Insurer Reimbursement Amount, to the extent not paid pursuant to clauses (2)(B) and (3) above; and

(iii)    third, concurrently, to the Group 1 Certificates, Group 3 Certificates and Group 4 Certificates, pro rata based on Class Principal Balance (after any payments to such Certificates from the related Group Principal Distribution Amount), until their respective Class Principal Balances are reduced to zero;

(c)    in an amount up to the Group 3 Principal Distribution Amount for such Distribution Date, sequentially:

(i)      first, concurrently, to the Group 3 Certificates, pro rata based on Class Principal Balance, until their respective Class Principal Balances are reduced to zero; and

(ii)     second, concurrently, to the Group 1 Certificates, Group 2 Certificates and Group 4 Certificates, pro rata based on Class Principal Balance (after any payments to such Certificates from the related Group Principal Distribution Amount), until their respective Class Principal Balances are reduced to zero; and

(d)    in an amount up to the Group 4 Principal Distribution Amount for such Distribution Date, sequentially:

(i)      first, concurrently, to the Group 4 Certificates, pro rata based on Class Principal Balance, until their respective Class Principal Balances are reduced to zero;

(ii)     second, to the Certificate Insurer, up to the Class 4-A-2 Certificate Insurer Reimbursement Amount, to the extent not paid pursuant to clauses (2)(B) and (3) above; and

(iii)    third, concurrently, to the Group 1 Certificates, Group 2 Certificates and Group 3 Certificates, pro rata based on Class Principal Balance (after any payments to such Certificates from the related Group Principal Distribution Amount), until their respective Class Principal Balances are reduced to zero; and

(2)   second, to the Certificate Insurer, up to the Aggregate Certificate Insurer Reimbursement Amount, if any, to the extent not paid pursuant to clauses (2)(B), (3), (5)(A)(1)(a)(ii), (5)(A)(1)(b)(ii) or (5)(A)(1)(d)(ii) above; and

(3)   third, sequentially, to the Class M-1, Class M-2, Class M-3, Class M-4, Class M-5, Class M-6, Class M-7 and Class M-8 Certificates, in that order, until their respective Class Principal Balances are reduced to zero; and

(B) On each Distribution Date (a) on or after the Stepdown Date and (b) on which a Trigger Event is not in effect, in the following order of priority, in an amount up to the Principal Distribution Amount:

(1)   first, in an amount up to the Senior Principal Distribution Amount for that Distribution Date, concurrently, to the following Classes of Certificates, pro rata on the basis of the related Group Senior Principal Distribution Amount:

(a)    in an amount up to the Group 1 Senior Principal Distribution Amount for such Distribution Date, sequentially:

2

      (i)     first, concurrently, to the Group 1 Certificates, pro rata based on Class Principal Balance, until their respective Class Principal Balances are reduced to zero;

      (ii)    second, to the Certificate Insurer, up to the Class 1-A-3 Certificate Insurer Reimbursement Amount, to the extent not paid pursuant to clauses (2)(B) and (3) above; and

      (iii)   third, concurrently, to the Group 2 Certificates, Group 3 Certificates and Group 4 Certificates, pro rata based on Class Principal Balance (after any payments to such Certificates from the related Group Senior Principal Distribution Amount), until their respective Class Principal Balances are reduced to zero;

(b) in an amount up to the Group 2 Senior Principal Distribution Amount for such Distribution Date, sequentially:

      (i)     first, concurrently, to the Group 2 Certificates, pro rata based on Class Principal Balance, until their respective Class Principal Balances are reduced to zero;

      (ii)    second, to the Certificate Insurer, up to the Class 2-A-3 Certificate Insurer Reimbursement Amount, to the extent not paid pursuant to clauses (2)(B) and (3) above; and

      (iii)   third, concurrently, to the Group 1 Certificates, Group 3 Certificates and Group 4 Certificates, pro rata based on Class Principal Balance (after any payments to such Certificates from the related Group Senior Principal Distribution Amount), until their respective Class Principal Balances are reduced to zero;

(c) in an amount up to the Group 3 Senior Principal Distribution Amount for such Distribution Date, sequentially:

      (i)     first, concurrently, to the Group 3 Certificates, pro rata based on Class Principal Balance, until their respective Class Principal Balances are reduced to zero; and

      (ii)    second, concurrently, to the Group 1 Certificates, Group 2 Certificates and Group 4 Certificates, pro rata based on Class Principal Balance (after any payments to such Certificates from the related Group Senior Principal Distribution Amount), until their respective Class Principal Balances are reduced to zero; and

(d) in an amount up to the Group 4 Senior Principal Distribution Amount for such Distribution Date, sequentially:

      (i)     first, concurrently, to the Group 4 Certificates, pro rata based on Class Principal Balance, until their respective Class Principal Balances are reduced to zero; and

      (ii)    second, to the Certificate Insurer, up to the Class 4-A-2 Certificate Insurer Reimbursement Amount, to the extent not paid pursuant to clauses (2)(B) and (3) above; and

      (iii)   third, concurrently, to the Group 1 Certificates, Group 2 Certificates and Group 3 Certificates, pro rata based on Class Principal Balance (after any payments to such Certificates from the related Group Senior Principal Distribution Amount), until their respective Class Principal Balances are reduced to zero; and

(2) second, to the Certificate Insurer, up to the Aggregate Certificate Insurer Reimbursement Amount, to the extent not paid pursuant to clauses (2)(B), (3), (5)(B)(1)(a)(ii), (5)(B)(1)(b)(ii), or (5)(B) (1)(d)(ii) above; and

3

(3) third, sequentially, to the Class M-1, Class M-2, Class M-3, Class M-4, Class M-5, Class M-6, Class M-7 and Class M-8 Certificates, in that order, in an amount up to the Mezzanine Principal Distribution Amount for each such Class, until their respective Class Principal Balances are reduced to zero; and

(6) *sixth*, to the Class or Classes of Certificates then entitled to receive distributions of principal pursuant to clause (5)(A) or (5)(B) above, in an amount up to any Overcollateralization Maintenance Amount (as included in the Principal Distribution Amount) for such Distribution Date, in the order of priority set forth in clause (5)(A) or (5)(B) above, as applicable;

(7) *seventh*, sequentially, to the Class M-1, Class M-2, Class M-3, Class M-4, Class M-5, Class M-6, Class M-7 and Class M-8 Certificates, in that order, the Interest Carry Forward Amount for each such Class and such Distribution Date;

(8) *eighth*, concurrently, to the Senior Certificates (other than the Interest Only Certificates), pro rata based on the aggregate Unpaid Realized Loss Amounts with respect to each group of Senior Certificates (other than the Interest Only Certificates):

(a) with respect to the Group 1 Certificates, *first*, sequentially, to the Class 1-A-1, Class 1-A-2 and Class 1-A-3 Certificates, in that order, in an amount up to the Unpaid Realized Loss Amount for each such Class of Senior Certificates, and in the case of the Class 1-A-3 Certificates, to the extent not covered by the Certificate Insurance Policy and *second*, to the Certificate Insurer, in an amount up to the Class 1-A-3 Certificate Insurer Reimbursement Amount, if any, to the extent not paid pursuant to clause (5) above;

(b) with respect to the Group 2 Certificates, *first*, sequentially, to the Class 2-A-1, Class 2-A-2 and Class 2-A-3 Certificates, in that order, in an amount up to the Unpaid Realized Loss Amount for each such Class of Senior Certificates, and in the case of the Class 2-A-3 Certificates, to the extent not covered by the Certificate Insurance Policy and *second*, to the Certificate Insurer, in an amount up to the Class 2-A-3 Certificate Insurer Reimbursement Amount, if any, to the extent not paid pursuant to clause (5) above;

(c) with respect to the Group 3 Certificates, sequentially, to the Class 3-A-1 and Class 3-A-2 Certificates, in that order, in an amount up to the amount of Unpaid Realized Loss Amount for such Class of Senior Certificates; and

(d) with respect to the Group 4 Certificates, sequentially, *first*, to the Class 4-A-1A and Class 4-A-1B Certificates, pro rata based on Class Principal Balance, *second*, to the Class 4-A-2 Certificates, each in an amount up to the Unpaid Realized Loss Amount for such Class of Senior Certificates, and in the case of the Class 4-A-2 Certificates, to the extent not covered by the Certificate Insurance Policy and *third*, to the Certificate Insurer, in an amount up to the Class 4-A-2 Certificate Insurer Reimbursement Amount, if any, to the extent not paid pursuant to clause (5).

(9) *ninth*, to the Certificate Insurer, up to the Aggregate Certificate Insurer Reimbursement Amount, to the extent not paid pursuant to clauses (5) and (8) above;

(10) *tenth*, sequentially, to the Class M-1, Class M-2, Class M-3, Class M-4, Class M-5, Class M-6, Class M-7 and Class M-8 Certificates, in that order, in an amount up to the Unpaid Realized Loss Amount for each such Class of Certificates;

(11) *eleventh*, to the Class XW Certificates, in an amount up to the Net Rate Carryover for such Class of Certificates;

4

(12) *twelfth*, concurrently, to the Senior Certificates (other than the Interest Only Certificates), pro rata based on the amount of Net Rate Carryover with respect to each such Class of Certificates, in an amount up to the Net Rate Carryover for each such Class of Certificates;

(13) *thirteenth*, sequentially, to the Class M-1, Class M-2, Class M-3, Class M-4, Class M-5, Class M-6, Class M-7 and Class M-8 Certificates, in that order, in an amount up to the Net Rate Carryover for each such Class of Certificates;

(14) *fourteenth*, to the Class C Certificates; and

(15) *fifteenth*, any remaining amounts to the Class R Certificates; provided that (A) if such Distribution Date follows the Prepayment Period during which occurs the latest date on which a prepayment charge may be required to be paid in respect of any Mortgage Loans or if such Distribution Date is the final Distribution Date, the Trust Administrator shall withdraw any amounts on deposit in the Class P Reserve Fund and distribute such amounts to the Holders of the Class P Certificates, pro rata according to Class Principal Balance, in reduction of their respective Class Principal Balances, until their respective Class Principal Balances are reduced to zero and (B) any distributions pursuant to clauses (6) through (15) above will be made prior to any distributions from the Carryover Reserve Fund, the Cap Account and the Mezzanine Cap Account.

(b) *Application of Class P Prepayment Charges.* On each Distribution Date prior to the date on which the Class Principal Balance of the Class 1-P Certificates has been reduced to zero, the Trust Administrator shall withdraw from the Distribution Account and distribute to the Class 1-P Certificates any Class P Prepayment Charges related to the Group 1 Loans.

On each Distribution Date prior to the date on which the Class Principal Balance of the Class 2-P Certificates has been reduced to zero, the Trust Administrator shall withdraw from the Distribution Account and distribute to the Class 2-P Certificates any Class P Prepayment Charges related to the Group 2 Loans.

On each Distribution Date prior to the date on which the Class Principal Balance of the Class 3-P Certificates has been reduced to zero, the Trust Administrator shall withdraw from the Distribution Account and distribute to the Class 3-P Certificates any Class P Prepayment Charges related to the Group 3 Loans.

On each Distribution Date prior to the date on which the Class Principal Balance of the Class 4-P Certificates has been reduced to zero, the Trust Administrator shall withdraw from the Distribution Account and distribute to the Class 4-P Certificates any Class P Prepayment Charges related to the Group 4 Loans.

(c) *Application of Applied Realized Loss Amounts.* On each Distribution Date, the Trust Administrator shall allocate any Applied Realized Loss Amount, *first*, to reduce the Class Principal Balances of the Class M-8, Class M-7, Class M-6, Class M-5, Class M-4, Class M-3, Class M-2 and Class M-1 Certificates, sequentially, in that order, in each case until their respective Class Principal Balances are reduced to zero and *second*, pro rata, to the Group 1 Certificates, Group 2 Certificates, Group 3 Certificates and Group 4 Certificates (a) to reduce the Class Principal Balances of the Class 1-A-3, Class 1-A-2 and Class 1-A-1 Certificates, in that order, until their respective Class Principal Balances are reduced to zero, (b) to reduce the Class Principal Balances of the Class 2-A-3, Class 2-A-2 and Class 2-A-1 Certificates, in that order, until their respective Class Principal Balances are reduced to zero, (c) to reduce the Class Principal Balances of the Class 3-A-2 and Class 3-A-1 Certificates, in that order, until their respective Class Principal Balances are reduced to zero, and (d) to reduce the Class Principal Balances of the Group 4 Certificates, sequentially, *first*, to the Class 4-A-2

5

Certificates, and *second*, to the Class 4-A-1A and Class 4-A-1B Certificates, pro rata based on Class Principal Balance, until their respective Class Principal Balances are reduced to zero.

(d)   *Application of Subsequent Recoveries*. On each Distribution Date, the Trust Administrator shall allocate the amount of the Subsequent Recoveries, if any, to increase the Class Principal Balance of the Classes of Certificates to which Applied Realized Loss Amounts have been previously allocated, *first*, pro rata based on the Applied Realized Loss Amounts previously allocated the Group 1 Certificates, Group 2 Certificates, Group 3 Certificates and Group 4 Certificates, (a) sequentially, to the Class 1-A-1, Class 1-A-2 and Class 1-A-3 Certificates, in that order, in each case by not more than the amount of the Unpaid Realized Loss Amount for each such Class, (b) sequentially, to the Class 2-A-1, Class 2-A-2 and Class 2-A-3 Certificates, in that order, in each case by not more than the amount of the Unpaid Realized Loss Amount for each such Class, (c) sequentially, to the Class 3-A-1 and Class 3-A-2 Certificates, in that order, in each case by not more than the amount of the Unpaid Realized Loss Amount for each such Class and (d) sequentially, *first*, to the Class 4-A-1A and Class 4-A-1B Certificates, pro rata based on Class Principal Balance and *second*, to the Class 4-A-2 Certificates, in each case by not more than the amount of the Unpaid Realized Loss Amount for such Class, and *second*, sequentially, to the Class M-1, Class M-2, Class M-3, Class M-4, Class M-5, Class M-6, Class M-7 and Class M-8 Certificates, in that order, in each case by not more than the amount of the Unpaid Realized Loss Amount of such Class.

Holders of Certificates to which any Subsequent Recoveries have been allocated shall not be entitled to any payment in respect of Current Interest on the amount of such increases for any Accrual Period preceding the Distribution Date on which such increase occurs.

6