UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x
WELLS FARGO BANK, N.A.,
                                    :
            Plaintiff,                   REPORT & RECOMMENDATION
                                    :
        -against-                        10 Civ. 7332 (AJN)(MHD)
                                    :
ESM FUND I, LP, et al.,
                                    :
            Defendants.
------------------------------x

TO THE HONORABLE ALISON J. NATHAN, U.S.D.J.:


        By order dated December 13, 2011, the District Court (Sand,

J.) directed entry of judgment in this interpleader action. That

judgment effectuated the prior directives of the court to the

effect that funds originally payable to the so-called Super Senior

certificate holders under the MASTR Adjustable Rate Mortgages Trust

2006-OA2 must in fact be paid to those investors rather than -- as

plaintiff Wells Fargo Bank, N.A. (the "Bank" or "Wells Fargo") had

incorrectly assumed -- to defendant Assured Guaranty Municipal

Corp. ("Assured") to reimburse Assured for its payments to another

class of certificate holders. This ruling affected two separate

funds -- one amounting to approximately $7.2 million that Wells

Fargo had credited to Assured in August 2010, and a much larger

sum, held in an interest-bearing escrow account by Wells Fargo,

representing payments for subsequent months that the Bank was

1

withholding from transmission to either the Super Senior
certificate holders or the insurance carrier's insureds (the
"Senior Support certificate holders" or "insured certificate
holders") pending resolution of payment priorities under the
governing Pooling and Servicing Agreement.

In substance, the judgment that was entered required that
Wells Fargo claw back the $7.2 million in payments that had been
made to the Senior Support certificate holders (the insured
certificate holders) on behalf of Assured. It further required that
those moneys, as well as the funds being held in the escrow
account, be paid over to the Super Senior certificate holders.

In the wake of entry of the judgment, defendant Assured has
move for a stay of the judgment pending its current appeal to the
Second Circuit. Defendant ESM Fund I, representing some of the
Super Senior certificate holders, and two intervenor Super Senior
investors have opposed the motion. Wells Fargo has taken no
position on the dispute. For the reasons that follow, we recommend
that the motion for a stay be granted.

Prior Proceedings

Plaintiff Wells Fargo commenced this interpleader action as Trust Administrator in order to obtain a ruling as to the respective rights of defendants to distributions made under the MASTR Adjustable Rate Mortgages Trust 2006-OA2. In substance, the court was required to determine whether Wells Fargo had correctly interpreted the governing trust document, known as the Pooling and Servicing Agreement ("P&SA"), when it credited to defendant Assured in August 2010 the sum of $7,199,157.47, thus reimbursing Assured for its obligation to pay that amount to the insured certificate holders of the trust (a/k/a Senior Support certificate holders). That payment decision was contested by some of the uninsured Super Senior certificate holders, who are represented here principally by ESM Fund I ("the ESM defendants") and who contended that they were entitled to receive their undiminished monthly principal payments under the P&SA.

By opinion dated March 29, 2011, the District Court upheld the interpretation proffered by the Super Senior certificate holders, granting them judgment on the pleadings against Wells Fargo on that question. In doing so, the court held that Assured was entitled only to be subrogated to the rights of the insured certificate

3

holders. <u>Wells Fargo Bank, N.A. v. ESM Fund I, LP</u>, 785 F. Supp.2d 188, 193-97 (S.D.N.Y. 2011). The court further directed that Assured was "to repay to the Trust the $7,199,157.47 credited to it by Wells Fargo", and that Wells Fargo was to distribute those funds to the certificate holders in accordance with the court's interpretation of the payment provisions of the P&SA. <u>Id.</u> at 197. The court further addressed the disposition of the succeeding months' payments by Wells Fargo, all of which had been deposited in escrow while the case was pending. As to those funds, the court again directed Wells Fargo to distribute them, with interest, in accordance with the terms of the P&SA as interpreted by the court. <u>Id.</u> at 199.[1]

---

[1] The court also disposed of certain other claims and applications by the parties. Thus, it dismissed the three cross-claims of the ESM defendants against Assured; as to two of those claims (for reformation and unjust enrichment), the court held them to be moot, and the third, for breach of Assured's insurance agreement, it found inadequate because the uninsured certificate holders lacked standing to assert it. <u>Id.</u> at 197-98. The court granted a motion by Wells Fargo for discharge and protection from further liability over its past handling of the trust funds, since the interpleader itself had been properly brought. <u>Id.</u> at 198. The court also granted plaintiff "reasonable attorney's fees and costs" in its capacity as innocent stakeholder, to be awarded against the interpleader fund, and it directed the Bank to make a "detailed accounting of its attorneys' fees and costs" in support of its application for a specific award under Rule 54. <u>Id.</u> at 198, 199. Finally, it directed plaintiff to submit a proposed judgment. <u>Id.</u> at 199.

In the wake of that decision, the parties found themselves
unable to agree on a range of issues implicated by the drafting of
a judgment. Of particular note, those disputes included the means
by which the $7.2 million was to be collected for payment to the
Super Senior certificate holders, and whether retroactive payments
for each month should be made to the current certificate holders or
to those who held title in each of those months.[2] Ultimately the
court ruled that Wells Fargo should be authorized to claw the $7.2
million back from the insured certificate holders, whom Wells Fargo
had reimbursed for their investment losses (with a credit for those
payments going to Assured for that sum), and payments for past
months should be made to the holders of record as of the time of
the payments rather than to prior certificate owners. (Nov. 3, 2011
Report & Recommendation ("R&R") at 9-10, 12; Order dated Dec. 13,
2011 at ¶¶ 3, 7-8). We understand that the claw-back has been
successful, although the funds are being held in escrow pending a
determination of the current stay motion.[3]

---

[2] Other issues concerned whether the judgment should specify
the exact amounts to be paid to each class of certificate holders
for each month, the amount of fees and costs to be awarded to
Wells Fargo and who should bear the cost, whether a common-fund
fee award should be made to ESM for the work of its attorneys and
if so, what the size of that award should be and who should pay
for it.

[3] The parties previously stipulated to a post-judgment stay
for the period during which an appeal-stay motion by Assured was

5

Assured has filed an appeal, with briefing to be completed by July.

### The Current Application

Assured has sought a stay of enforcement of the judgment, the net effect of which would be to require that the previously escrowed funds for the months September 2010 and going forward remain in escrow pending the appeal rather than being paid out and that the clawed-back payments for August 2010 also remain in escrow until the appeal is decided. Assured argues principally that retaining these funds in a segregated account -- rather than paying them to the certificate holders -- is necessary to ensure that if the Second Circuit reverses the merits decision of this court, the carrier will be able to recover the funds owed to it. (Assured Stay Mem. of Law at 9-11; Assured Reply Mem. of Law at 5-7). Assured also argues that its appeal raises significant issues and has a substantial potential to succeed, and that a stay would pose no irreparable harm to the certificate holders since the funds would remain in an interest-bearing account. (Assured Stay Mem. of Law at 6-8, 11-14; Assured Reply Mem. of Law at 2-5, 7-9).

---

pending. (R&R at 8 n.3; Sept. 12, 2011 Tr. 31).

ESM opposes, arguing principally that the appeal has no chance of success and that denying the certificate holders access to their moneys pending the appeal will cause them irreparable harm, principally because they could invest the money more profitably and because, while the funds are escrowed, they are unable to dispose of their certificates for anything approaching their fair market value. (ESM Opp'n Mem. of Law at 7-10, 13-16).[4] They also suggest that emptying the escrow account to pay them now would not pose a problem for Assured even in the event of a reversal, because Wells Fargo could then claw back the money from the Super Senior investors, as it did earlier with respect to the $7.2 million recovered from the insured certificate holders. They go on to argue as well that it is highly likely -- even if a clawback fails -- that sufficient additional mortgage payment revenues will enter the trust in the next three to five years to permit full repayment to Assured. (Id. at 10-13). Finally, ESM argues that if the court grants a stay it should compel Assured to post a bond in the amount of $16.2 million, reflecting a 5.25 percent interest rate on the moneys currently withheld from the certificate holders. (Id. at 16-17.).

---

[4] Two intervenor certificate holders make very similar arguments. (See Decl. & Mem. of Law of Alexander Bakal; Mem. of Law of David Visher).

7

ANALYSIS

The determination whether to stay enforcement of a judgment pending an appeal is within the discretion of the District Court. Nken v. Holder, 129 S.Ct. 1749, 1760-61 (2009). The four oft-cited criteria are "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." Id. at 1761 (quoting Hilton v. Braunskill, 481 U.S. 770, 776 (1987)). While stated in these terms, the test contemplates that a movant may be granted relief even if it demonstrates something less than a likelihood of success on the merits of its appeal. Thus, if it shows "serious questions" going to the merits of its appeal as well as irreparable harm, the stay may be granted if the balance of hardships "tips decidedly" in favor of the moving party. See, e.g., Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd., 598 F.3d 30, 34-38 (2d Cir. 2010)[5]; Thapa v. Gonzales,

---

[5] Citigroup Global Mkts., Inc. was decided in the context of a preliminary injunction, but the Supreme Court has recognized that the standard for evaluating a motion for preliminary injunctive relief has "substantial overlap" with that of a motion for a stay pending appeal, because "similar concerns arise whenever a court order may allow or disallow anticipated action

460 F.3d 323, 335 (2d Cir. 2004) (a stay may be appropriate if the movant can "demonstrate . . . some possibility of success and the balance of hardships tips decidedly in his favor."). As summarized by our circuit in an earlier decision, "'[t]he necessary "level" or "degree" of possibility of success will vary according to the court's assessment of the other [stay] factors.'" Mohammed v. Reno, 309 F.3d 95, 101 (2d Cir. 2002) (quoting Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc., 559 F.2d 841, 843 (D.C. Cir. 1987)). Thus, "'[t]he probability of success that must be demonstrated is inversely proportional to the amount of irreparable injury plaintiff[] will suffer absent the stay. Simply stated, more of one excuses less of the other.'" Id. (quoting Michigan Coal. of Radioactive Materials Users, Inc. v. Griepentrog, 945 F.2d 150, 153 (6th Cir. 1991)); see also Greenidge v. Allstate Ins. Co., 2003 WL 22871905, *2 (S.D.N.Y. Dec. 3, 2003). Nonetheless, the movant cannot prevail based purely on speculation as to possible success or harm. Nken, 129 S.Ct. at 1761.

Applying these criteria, we conclude that a stay is appropriate in this case. On the question of the merits of the appeal, we do not agree with Assured's assertion that it has

---

before the legality of that action has been conclusively determined." Nken, 129 S.Ct. at 1761.

demonstrated a likelihood of success. The analysis offered by Judge Sand in interpreting the P&SA is persuasive, and we therefore do not share Assured's stated optimism about its own prospects before the Second Circuit. That said, the argument that Assured's appeal necessarily poses -- to the effect that the P&SA is, in pertinent terms, at least ambiguous -- is colorable. The complexity of the agreement (see, e.g., Assured Reply Mem. of Law at 7-8) and the fact that Wells Fargo itself originally interpreted its terms in a manner consistent with the reading by Assured at least raise the not-purely-speculative possibility that the appellate court may conclude that reasonable people could differ as to its meaning, a conclusion that could dictate creation of a factual record regarding such issues as its drafting history and industry practice.[6]

Since Assured has a colorable, if not very robust, basis for an appeal, we turn to the question of irreparable harms invoked -- albeit in contrasting ways -- by Assured and, in opposition, by the Super Senior certificate holders. We find that Assured has made a

---

[6] Assured indicates that it is also arguing on appeal that the agreement unambiguously supports its reading and that in deciding a Rule 12(b)(6) motion the District Court erred in relying on what Assured terms "extrinsic evidence" -- the purportedly extrinsic evidence being the Prospectus Supplement that accompanied the P&SA.

sufficient showing of potential irreparable harm if a stay is denied and that this harm substantially outweighs such arguable harm as the certificate holders posit.

In the event that the Second Circuit reverses the District Court decision and, on remand after discovery, the court concludes that Assured was entitled to the funds at issue, the practical question posed will be how that ruling may be carried out. As long as the funds in question remain in escrow, that will be a very simple process. If, however, the escrowed funds -- which apparently totaled somewhere in the area of $120 to $140 million as of the time of oral argument (Mar. 9, 2012 Tr. 7, 12, 30; see also Outerson Dec. ¶ 2) -- are now released to the accounts of the certificate holders, it is less clear how and whether Assured can be fully reimbursed.

The certificate holders offer two routes to satisfaction of such a judgment. First, they say, Wells Fargo may undertake the same claw-back procedure for the funds in question that it utilized to reacquire the moneys that were paid on Assured's behalf in August 2010 to the insured certificate holders. Second, they argue that ultimately the continuing flow of mortgage payments into the trust will suffice, over a period of years (estimated at three to

11

five), to reimburse Assured for its lost payments. Neither of these approaches is particularly reassuring in alleviating the potential that Assured may be left holding the proverbial bag, and the second would, in effect, deny Assured the fruits of its legal claim to priority.

As became apparent during the period preceding September 2011, under the Depository Trust & Clearing Corporation ("DTC") rules governing the distribution of funds coming into the trust, Wells Fargo may claw back moneys already distributed only for a period of one year from distribution. (See Assured Stay Mem. of Law at 9; Abensohn Decl. Ex. 2). In the event that a decision by the Second Circuit on Assured's appeal is not forthcoming within that time period, a clawback may not be an available method of recovery.[7]

---

[7] The one-year clawback deadline proved not to be a fatal obstacle in dealing with the $7.2 million paid out in August 2010 to the insured certificate holders because (1) Judge Sand delivered his decision on March 29, 2011, only seven months after payment had been made by Wells Fargo, determining that the money had been improperly paid out and thus needed to be clawed back, and (2) Wells Fargo applied for, and received, permission from the court for such a clawback before the one-year period had expired, even though judgment had not yet been entered. See Wells Fargo Bank, N.A., 785 F. Supp.2d at 197-99; Endorsed Order dated Aug. 11, 2011. Given the entry of judgment in favor of the Super Senior certificate holders and the pendency of Assured's appeal, no comparable application could be successfully made until after the Second Circuit rules on Assured's appeal.

As for the certificate holders' assertion that mortgage funds will continue to stream into the trust in amounts that will eventually suffice to reimburse Assured, that suggestion fails for two reasons. First, this assumption is just that -- a prediction that, although likely to be fulfilled,[8] rests on uncertain future events, most notably the default rate on the mortgages that have been included in the investment instruments that are part of the trust. The events of the last four years in the housing market leave the actual return over the next few years less a provable matter of fact than a prediction that may or may not prove accurate.

Second, even if the future flow of revenue into the trust accords with the certificate holders' estimates, not only will Assured be left to wait some number of years for full recovery,[9] but the carrier will effectively be denied the priority that it has

_____

[8] The certificate holders represent that the trust is entitled to receive approximately $900 million in revenues over a multi-year period. (Mar. 9, 2012 Tr. 13).

[9] In fairness, we note that the granting of the stay will cause a delay in the certificate holders' receipt of what is now presumptively their moneys, but that delay is likely to be far shorter than the estimated three to five years for Assured absent a successful clawback, and, most importantly, it would come with no risk to the certificate holders that the principal amount and interest will not be available to the investors.

13

been seeking to establish in this lawsuit. The second scenario envisioned by the certificate holders is that they will be paid first and Assured will then have to wait -- even if it prevails in this lawsuit -- for other revenues to enter the trust before it is reimbursed for its insurance payouts. That result would deprive Assured of its asserted right to priority -- which would be established if the carrier prevails on its appeal and, if necessary, on a remand -- and that deprivation too represents a form of irreparable harm.

In short, denial of a stay poses a serious prospect of irreparable harm to Assured. In contrast, the cited harms to the Super Senior certificate holders appear far more evanescent. The principal harm cited by them in the event of a stay pending appeal is that they will have to wait to receive the funds now deemed to be owed to them until a decision by the Second Circuit. That delay is not disputed, but the nature and extent of the harm is not comparable to what Assured may face absent a stay.

In the event of an affirmance by our circuit court, there is no danger, even with a stay, that the certificate holders will not be paid the full amounts of which they have been deprived by Wells Fargo. Moreover, the funds are now reposing in an interest-bearing

14

account, which is apparently paying interest at a rate of .3 or .4 percent (Mar. 9, 2012 Tr. 18, 33, 39; ESM Opp'n Mem. of Law at 14-15), a figure that substantially exceeds the current federal post-judgment interest rate, as dictated by 28 U.S.C. § 1961. See Administrative Office of the U.S. Courts, Post-Judgement Interest Rates, at http://www.uscourts.gov/FormsAndFees/Fees/PostJudgement Interest Rates.aspx (providing both current and prior weekly post-judgment interest rates) (last visited Apr. 2, 2012); see also ESM Opp'n Mem. of Law at 14-15 (noting current rate of .11 percent); Mar. 9, 2012 Tr. 18 (same).[10] In essence, the investors complain that despite these safeguards they will face irreparable harm because, if they had access to these funds now, they are confident that they would be able to invest them more productively, that is, in securities or other income-generating businesses the return from which would exceed the modest interest rate generated by the escrow accounts in which the funds are now invested.

It is certainly possible that the investors might do better than the escrow interest rate of return, but they do not

---

[10] The investors are also being paid interest by the trust on owed principal at stated rates of up to 3.3 percent (Outerson Decl. ¶ 4; Mar. 9, 2012 Tr. 15-16), although it appears that there may be a shortfall in the trust that is limiting the comprehensiveness of these payments. (Id. at 16-18, 27-28, 39-41).

demonstrate with any specifics that that would be the case.[11]
Moreover, they entirely ignore the potential losses that they may
suffer if they invest these moneys in any more risky ventures than
the accounts in which the funds now repose.

In any event, this type of irreparable-harm argument could be
made in virtually every case of this type involving title to
moneys, and yet the courts have, with some consistency, declined to
compel enforcement of judgments pending appeal when the funds
targeted by the judgment are segregated and held in escrow in a
safe, interest-bearing account. <u>See</u>, <u>e.g.</u>, <u>Palm Props., LLC v.
Metro. Nat'l Bank</u>, 2010 WL 2976157, *2 (E.D. Ark. July 22, 2010);
<u>Life Ins. Co. of N. Am. v. Camm</u>, 2007 WL 2492384, *1-*2 (N.D. Ind.
Aug. 29, 2007); <u>Florida Land Title Co. v. Martinez</u>, 1996 WL 73386,
*1-*3 (M.D. Fla. Jan. 26, 1996); <u>Foster v. Hallco Mfg. Co.</u>, 835 F.
Supp. 1235, 1236 (D. Ore. 1993); <u>see also</u> <u>In re Klein Sleep Prods.
Inc.</u>, 1994 WL 652459, *2 (S.D.N.Y. Nov. 18, 1994). The underlying
assumption of these decisions -- that such an arrangement precludes

---

[11] We note that one intervenor -- Alexander Bakal -- reported
having purchased certificates during the pendency of the lawsuit
at a two-thirds discount, and pointed out that he is thus earning
effective interest of up to approximately nine percent. (<u>See</u> Mar.
9, 2012 Tr. 28-30). That of course reflects some investment
acumen on his part but does not establish a basis for finding
irreparable harm in this context.

16

a viable claim of irreparable harm -- is mirrored by the provision
governing stays of monetary judgments based on the posting of a
supersedeas bond in the amount of the judgment. <u>See</u> Fed. R. Civ. P.
62(d). Similarly, the fact that the federal post-judgment interest
statute provides for a return that, currently, is even lower than
that earned by the escrow accounts at issue here underscores the
weakness of an assertion of irreparable harm based on the loss of
the time value of money in this context. In short, a party's
general expectations as to his ability to earn above-market rates
if he had access to contested funds does not ordinarily demonstrate
irreparable harm and is not, in itself, an adequate basis on which
to deny a stay.

    As for the certificate holders' other claimed harm -- that the
pendency of the stay will depress the market value of their
investments -- it is still less persuasive. We assume that the
current market for those certificates is depressed, although no
competent evidentiary proffer has been made in support of that
contention, but that effect is presumably a function, in whole or
in part, of the original decision by Wells Fargo to divert payments
otherwise due the Super Senior investors in favor of paying
Assured, as well as the resultant pendency of this lawsuit. That
depressive effect on the market -- the source of which is also not

17

demonstrated by the certificate holders in any competent fashion --
will presumably not be fully alleviated for those investors until
the Second Circuit acts on the current appeal, irrespective of
whether the stay is maintained or lifted.

In any event, there is no evidence in the record that the
Super Senior certificate holders have any pressing need to sell
their certificates or even a desire to do so. Indeed, at least one
of the investors who have appeared personally in this action
apparently purchased his certificates at a steep discount --
reflecting at least a two-thirds reduction from face value -- and
presumably would in any event wait for the effect of the Second
Circuit's hoped-for affirmance, which would likely radically boost
the market value of his certificates. In short, the market-value
argument reflects nothing more than speculation about market
dynamics and fails to suggest any irreparable harm to the affected
investors.

Given these considerations, we conclude that the risk to
Assured from denial of a stay -- that is, the potential inability
of Assured to recover some portion of the entire corpus at issue in
this case, as well as the potential loss of the underlying
entitlement that might otherwise be enforced if Assured prevails,

18

which is priority vis-a-vis the Super Senior investors -- is potentially far more extensive that what the Super Senior certificate holders face from the grant of a stay. In short, we conclude that the potential harm to Assured substantially outweighs any harm claimed by the uninsured certificate holders.

The only other cited consideration that is pertinent in balancing the parties' competing claims on this motion is the public interest. We do not see a compelling public concern that favors one result or another in this context.

In sum, we conclude that a balancing of the relevant factors justifies our conclusion that the judgment should be stayed pending appeal.

Finally, as noted, the certificate holders ask, in the alternative, for a bond of $16.2 million, apparently reflecting their assumption that if they prevail on appeal they will be entitled to an award of interest (assumed by them to be 5.25 percent) over and above the interest currently being earned on the escrowed funds. Although the court has discretion to condition a stay pending appeal on terms that serve equitable concerns, see, e.g., U2 Home Entm't, Inc. v. Lai Ying Music & Video Trading, Inc.,

19

Case 1:10-cv-07332-AJN-MHD   Document 145   Filed 04/03/12   Page 20 of 22


2007 WL 747794 *2 (S.D.N.Y. Mar. 12, 2007) (noting that a court
"has discretion in determining the terms of any bond that would
justify entry of a stay"), the certificate holders have not
articulated a legal basis for demanding such a bond. More
specifically, they have not demonstrated that, upon affirmance,
they would be entitled to a separate interest award, much less at
a rate of 5.25 percent. (Mar. 9, 2012 Tr. 19-25).[12] In addition,
they have not suggested that in the event of an affirmance and an
award of interest to them -- on whatever ground -- Assured would
potentially be unable to satisfy such a judgment. Accordingly, we
do not recommend a requirement that a bond be posted.


<u>CONCLUSION</u>


    For the reasons stated, we recommend that the motion of
defendant Assured for a stay pending appeal be granted.


    Pursuant to Rule 72 of the Federal Rules of Civil Procedure,

---

    [12] They apparently took that figure from a provision in the
P&SA that guarantees Assured interest of 5.25 percent on any
delayed payments to it. (ESM Opp'n Mem. of Law at 11-12 & n.6;
Mar. 9, 2012 Tr. 19-20). As they concede, there is no comparable
provision in that agreement under which the certificate holders
are entitled to an award of interest for delayed payments,
although, as noted, their escrowed funds are earning between .3
and .4 percent.

20

the parties shall have fourteen (14) days from this date to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of Court and served on all adversaries, with extra copies to be delivered to the chambers of the Honorable Alison J. Nathan, Room 615, 500 Pearl Street, New York, New York 10007, and to the chambers of the undersigned, Room 1670, 500 Pearl Street, New York, New York, 10007. Failure to file timely objections may constitute a waiver of those objections both in the District Court and on later appeal to the United States Court of Appeals. See Thomas v. Arn, 474 U.S. 140, 150 (1985); Small v. Sec'y of Health and Human Servs., 892 F.2d 15, 16 (2d Cir. 1989); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(d).


DATED: New York, New York
       April 3, 2012



                        RESPECTFULLY SUBMITTED,



                        _____
                        MICHAEL H. DOLINGER
                        UNITED STATES MAGISTRATE JUDGE

Copies of the foregoing Recommendation & Report have been mailed today to:

Dale Christian Christensen, Jr., Esq.
Thomas Ross Hooper, Esq.
Seward & Kissel LLP
One Battery Park Plaza
New York, NY 10004

Laura E. Krabill, Esq.
M. Norman Goldberger, Esq.
Ballard Spahr Andrews & Ingersoll, LLP
1735 Market Street
51st Floor
Philadelphia, PA 19103

Jarrett Michael Behar, Esq.
Sinnreich & Safar, LLP
320 Carleton Avenue, Ste. 3200
Central Islip, NY 11722

Philippe Zuard Selendy, Esq.
Quinn Emanuel Urquhart & Sullivan, LLP
51 Madison Avenue
New York, NY 10010

Eric P. Heichel, Esq.
Eiseman, Levine, Lehrhaupt & Kakoyiannis, P.C.
805 Third Avenue
10th Floor
New York, NY 10022

Mr. David Visher
28808 Cliffside Drive
Malibu, CA 90265

Mr. Alexander Bakal
34 Leonard Street, 5A
New York, NY 10013

Mr. Jean David Ittah
1500 Locust Street
Apt. 4213
Philadelphia, PA 19102